UNITED STATES *v.* PENNSYLVANIA SALT MANUFACTURING CO. (No. 4144) [1]

¹C. A. D. 22.

United States Court of Customs and Patent Appeals, October 31, 1938

Charles D. Lawrence, Acting Assistant Attorney General (Richard F. Weeks, special attorney, of counsel), for the United States.
Pickrell & McDonald for appellee.

[Oral argument October 10, 1938, by Mr. Weeks and Mr. Pickrell]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:[2]

In this case additional duties were assessed by the Collector of Customs at the port of Detroit, Mich., upon an importation from Germany of merchandise comprising a filter press, and accessories thereto, used in the manufacture of calcium hypochlorite from salt. Such additional duties were levied by reason of the provisions of section 489 of the Tariff Act of 1930. Under that same section appellee filed a petition for remission of the additional duties so assessed, which was heard by the United States Customs Court, First Division, and granted, McClelland, Presiding Judge, dissenting. From the judgment rendered, the Government appealed to this court.

The merchandise was entered June 13, 1934, upon a pro forma invoice, for which a consular invoice was subsequently substituted, at a value of 93,204 reichsmarks. This was the price, less certain nondutiable items and charges, shown upon the consular invoice. Upon final appraisement, seemingly in March 1935, based upon cost of production, the local appraiser advanced the value to 107,319.35 reichsmarks. There was an appeal to reappraisement which subsequently was abandoned.

Five companies, three domestic and two foreign, were connected in differing relationships with the transaction. The domestic companies were appellee (Pennsylvania Salt Manufacturing Co.); Pen-Chlor, Inc., and Chemnyco, Inc., often referred to in the record as the "American I. G." The foreign companies were the I. G. Farbenindustrie Aktiengesellschaft of Bitterfeld, Germany, generally referred throughout the record as "I. G." or "the German I. G.," and Wegelin & Huebner of Halle, Germany, who manufactured the filter press but not all of the accessories of the complete machine, many of the latter being supplied by the German I. G.

While the evidence respecting the activities of the companies named is rather meager, sufficient appears, when taken together with

---

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

agreed statements of counsel for the respective parties, to show that appellee is a producer of salt and operates mines in the state of Michigan, where it has a manufacturing plant located at Wyandotte; that the German I. G. is the owner of a process or processes, patented in the United States and apparently also in Germany, for making calcium hypochlorites from salt; that Chemnyco, Inc. (the American I. G.), "* * * is a corporation, of which the function is to furnish technical information to any client who asks it, in the nature of chemicals and engineering," it having been, at least in the transaction here involved, the United States representative of the German I. G., and that Pen-Chlor, Inc., described by one witness as an affiliate of appellee, was organized for the purpose of effecting an arrangement, later herein discussed, between appellee and the German I. G. It was testified that Pen-Chlor, Inc., at the time of the importation at issue, controlled the United States patent on the German I. G.'s process, and that it [Pen-Chlor, Inc.] was to be operated by officers of appellee.

The importer took the testimony of five witnesses and offered in evidence a number of documentary exhibits in the form of letters and cablegrams which were admitted.

The witnesses were Frank C. Frantz, office manager at appellee's Wyandotte plant, who supervised the making of the entry involved; Y. F. Hardcastle, vice president of appellee company and a director in Pen-Chlor, Inc.; Walker Penfield, appellee's manager of engineering; Warner R. Ober, comptroller of Pen-Chlor. Inc., and also associated with appellee in some capacity not definitely stated, and William Paul Pickhardt, vice president of Pen-Chlor, Inc., and president of Chemnyco, Inc.

The Government took no testimony, the only evidence offered by it being Exhibits 2, 3, and 4 of record, identified by the witness Penfield as letters which he wrote. These were introduced during Mr. Penfield's cross-examination.

Some of the testimony adduced is confusing and hard of interpretation. This largely grows out of the fact that some of the witnesses were connected with more than one of the companies, and where such a witness testifies, in substance, "we did so and so," or "my company did so and so," it is difficult to determine the particular company of which he speaks.

From the record as a whole, however, we deduce that in 1933 some sort of agreement was reached between appellee and the German I. G., by the terms of which appellee was to have the use of the German I. G.'s patented process for the manufacture, in the United States, of calcium hypochlorite from salt; that Chemnyco, Inc., acted as a liaison agency between them in the making of the agreement, and that Pen-Chlor, Inc., was formed as an agency to control

the patent and participate in executing the agreement, stock in Pen-Chlor, Inc., being taken by appellee, the German I. G., and Chemnyco, Inc. The agreement was not made a part of the record and but little information was given as to its terms. We do not know upon what basis the companies were doing business, nor how the expenses and profits were to be shared.

The testimony of Mr. Hardcastle on this point, in his direct examination, is confined to the following:

Q. What understanding is there, if any, between the owners of these patents and Pen-Chlor, Incorporated, as to the operation of this process?—A. The German I. G. was to give the Pennsylvania Salt Manufacturing Company to know how, in the construction and operation of the plant, to produce this patented process, and to produce calcium hypochlorite.

The witness was asked nothing concerning it on cross-examination. It will be recalled that he was vice president of appellee and a director in Pen-Chlor, Inc.

The witness Pickhardt, who was vice president of Pen-Chlor, Inc., and president of Chemnyco, Inc., gave no information as to the terms upon which the business was to be conducted, but he did testify as follows:

Q. What is the relationship of Pen-Chlor, Inc., with Chemnyco, Inc., as far as this filter press is concerned?—A. Chemnyco, Inc., is acting as technical adviser to Pen-Chlor in introducing these presses, details of which Chemnyco, Inc., have been receiving continuously from I. G. Farbenindustrie, the originators of the process. Chemnyco, Inc., also furnished several officers to Pen-Chlor, Inc., in order to establish as close as possible cooperation.

Q. What is the relationship of I. G. Farbenindustrie with Chemnyco, Inc., as far as this filter press is concerned?—A. I. G. Farbenindustrie owns half the stock of Pen-Chlor. It is under agreement to furnish all the information in regard to the process, and to assist in every way in getting the process in operation here. It also has agreed—I. G. Farbenindustrie has agreed to furnish the necessary apparatus and machinery for the process, and this machine is such an apparatus.

  *     *     *     *     *     *     *

Q. Was the I. G. Farbenindustrie and Chemnyco, Inc., the active agents of Pen-Chlor in the purchase of this machine from Wegelin & Huebner?—A. Yes.

Q. At my request——

Presiding Judge McClelland. Will you describe how this came about?

The Witness. Through an agreement between I. G. Farbenindustrie and Pennsylvania Salt Manufacturing Company, one of the first actions under that agreement being the formation of a company in which both were financially interested, I. G. Farbenindustrie was bound to furnish information——

Presiding Judge McClelland. How was that agency established for the purchasing of the machine?

The Witness. Through an agreement between I. G. Farbenindustrie and the Pennsylvania Salt Manufacturing Company.

Presiding Judge McClelland. How did your company convey to that foreign concern that they were to act as agents in the purchase of this machine?

The Witness. They had a chemist engineer in this country for some months, spending all of his time in the offices and laboratories of the Pennsylvania Salt

Manufacturing Company, where the factory of Pen-Chlor was to be built. He gave them all the necessary information, and part of that information was that they required a filter press of a certain type which had been worked out abroad, which is the machine here in question. They told them, "All right; go ahead and get us such a machine. What is it going to cost?" The correspondence which has just been put in evidence was that the price would be some 83,000 marks, and on the strength of that Pen-Chlor ordered it.

This seems to be a case in which counsel and the parties in interest, doubtless themselves fully familiar with the facts and the relationships between the several companies and individuals, overlooked making proof of some facts which might have been of aid to the courts in comprehending the case.

In the brief for appellee there is the following narration of facts, which we accept as being a correct interpretation of material portions of the testimonial record:

During the latter part of 1933 the appellee and the I. G. Farbenindustrie A. G. decided to form a partnership for the production of calcium hypochlorite in the United States. For the purpose of effectuating this partnership a corporation known as Pen-Chlor, Inc., was formed, the stock in which was to be equally divided between the two companies, and such company was to be operated and managed by officers of Penn Salt Mfg. Co.

To produce calcium hypochlorite in Michigan certain elaborate and complicated machinery was needed. Part of this machinery was known as a filter press.

The I. G. Farbenindustrie A. G. had purchased, a few years previous, suitable filter presses from Wegelin & Huebner, of Halle, Germany, for approximately 73,000 Reichsmarks each. Under date of December 14, 1933, the I. G. Farbenindustrie A. G. cabled that a filter press could be purchased for 73,000 Reichsmarks. Under date of January 24, 1934, the purchase of the filter press was authorized by cable. As certain accessories were necessary for the operation of the filter press the I. G. Farbenindustrie A. G. was authorized to purchase such accessories as its engineers deemed necessary.

Chemnyco, Inc., of New York City, a concern engaged as a chemical engineering consultant, acted throughout this transaction as a liaison agency between the parties, the appellee herein and the I. G. Farbenindustrie A. G.

In transmitting by cable the authorization to purchase the filter press under date of January 24, 1934, Chemnyco, Inc., advised the I. G. Farbenindustrie A. G. that Pen-Chlor, Inc. expected a formal offer from the manufacturer. This formal offer was submitted under date of January 29, 1934, which quoted the filter press at 72,885 Reichsmarks and certain other equipment at various prices not here material.

The filter press in a knocked down condition arrived and was entered at Detroit, Michigan, on June 13, 1934. The entry was made at the invoiced price of 93,204 Reichsmarks, which was 20,204 Reichsmarks in excess of the price quoted by the manufacturer under date of January 29, 1934.

On August 9, 1934, the I. G. Farbenindustrie A. G. forwarded to the appellee herein a second invoice in the amount of 108,816.67 Reichsmarks, purporting to cover the filter press, certain accessories and charges for labor, etc. performed by the I. G. Farbenindustrie A. G. The invoice of August 9, 1934, exceeded the original invoice by 26,604.67 Reichsmarks.

The prevailing opinion of the trial court states, *inter alia:*

Stripped of confusing phraseology and terminology the facts of this case are as follows. The petitioner, who asks to be relieved of automatic additional duties for unintentional undervaluation without fraud, ascertaining that it could purchase the filtering machine involved, after obtaining a bid from the makers, for about 73,000 reichsmarks plus certain accessories, ordered through its collaborator abroad, the I. G. Farbenindustrie A. G., on January 17, 1934, a filter press for 72,885 reichsmarks and for certain spare parts to cost 9,291 reichsmarks, the total aggregating 82,176 reichsmarks * * *. In addition to these spare parts it is authorized the purchase of additional equipment which in the opinion of the engineers of the I. G. Farbenindustrie A. G. was necessary * * *.

The machinery arrived in June in knocked-down condition accompanied by a consular invoice for 93,204 reichsmarks. The petitioner then entered the importation for customs at that figure, naturally supposing that the additional 20,000 reichsmarks above the bare cost of the machine included therein covered all the accessories necessary for the machine's operation.

The question is whether making that entry on June 13, 1934, at that figure in these circumstances was done in good faith without intention to defraud or deceive the Government. However, as it turned out afterward that the importer was mistaken, it seems to us perfectly natural and reasonable for any ordinarily prudent businessman to suppose that that invoice covered everything and to enter honestly at that figure.

* * * * * * *

Late in August another invoice, dated August 9, was received for 108,000 reichsmarks. There was surprise and evident chagrin and dispute arose involving 20,000 marks, which was not finally settled until December 1935, when they concluded that they had to pay the most of it. Naturally enough, while in dispute this was not previously disclosed to the customs. When acquiesced in, the appraisement had already been made. That is the long and short of it and however indefinite and uncertain a way of doing business it does not imply to our minds an intention to defraud or cheat the Government. On the contrary that sort of business conduct brings to our minds the contrary purpose.

The witnesses on the stand were clear cut and frank and testified without equivocation or evasion.

We have quoted the foregoing excerpts from the brief on behalf of appellee and the decision of the trial court at length, feeling that they render unnecessary a detailed review by us of all the evidence in the case.

We have no reason to differ from the court's conclusion that the witnesses testified "without equivocation or evasion" as to all matters concerning which inquiries were made of them.

The difficulty we experience in agreeing to the conclusion of the majority of the trial court arises from the fact that there was a failure to make any proof as to certain matters which, under the authorities, we think material in a case of this nature.

It must be remembered that this was not a transaction directly between appellee and the German manufacturer of the filter press. There were intermediaries. So far as we can determine, there was never privity between appellee and the German manufacturer of the

machine. It is not made clear what parties discussed the proposed agreement between appellee and the German I. G. in its incipiency in 1933. It does appear from the testimony of Mr. Hardcastle that "prior to June 1934  *  *  *  . We [whether appellee or Pen-Chlor, Inc., with both of which the witness was connected, not being indicated] learned that the German I. G. had purchased similar presses at the approximate cost of 73,000 marks—the press itself," and further, that in February 1934 Pen-Chlor, Inc., received an offer from the manufacturer at the price "for the press itself" of "some 72,000 marks."

Subsequent to the testimony of Mr. Hardcastle, Mr. Pickhardt was examined and, during his testimony, there were introduced in evidence two cablegrams contained in Collective Exhibit 9, the German language portions of which he translated into English while on the stand. The first of these, dated December 19, 1933, apparently was an incoming message to Chemnyco, Inc., the American I. G., from the German I. G., the pertinent part of which reads: "*  *  * we can offer 80,000 mark object at immediate payment, $27,000. Requesting decision immediately." The second, dated January 24, 1934, was an outgoing message from Chemnyco, Inc., to the German I. G., the pertinent portion reading: "*  *  * Pen-Chlor, Inc., approve press purchase Stop Figures submitted your cable December 19th were basis discussed, but Pen-Chlor, Inc., still expect formal offer from manufacturer."

There were placed in evidence as Exhibit 5 and Collective Exhibit 8, letters dated January 29, 1934, addressed by the manufacturer, Wegelin & Huebner, to Pen-Chlor, Inc., the latter containing copies of quotations of prices made to the German I. G., November 25, 1933, January 9, 1934, and January 10, 1934, upon the filter press and various accessories thereof.

In the meantime, however, as appears from Collective Exhibit 10, the German I. G. in a communication dated January 17, 1934 (which it will be observed was prior to the dates of both the Chemnyco, Inc., cablegram and the manufacturer's letter to Pen-Chlor, Inc., above referred to), placed an order with Wegelin & Huebner for a filter press and various accessories, these constituting the machine out of which the issue here arose. The order contains nothing which shows that it was ordered for appellee or any other party except the German I. G. itself. The total price listed was 82,176 reichsmarks.

Collective Exhibit 11 is a copy of an invoice made out to the German I. G. by Wegelin & Huebner, the total of which is 82,176 marks, the price of the filter press above being given as 72,885 marks.

A somewhat peculiar circumstance is that on December 10, 1934, long after the machine had been set up and operated at the Wyandotte, Mich., plant, and long after the second invoice of August 1934 had

been received, there appears to have been sent to the manufacturers in Germany a communication which counsel for appellee describes as a confirmation of the order given in the previous January. The paper is in evidence as Exhibit 6. It is divided into two portions, the first indicating that it is a price list of "Spare parts for double press filter." The total is not given in marks but in dollars as $3,203.80. The second portion names a double press filter at a total price of "72,855 R M. or $25,132.78." The paper as introduced bears no signature and, except for the statement of counsel for appellee to the effect that it went from appellee, we have no information as to who originated it. We do not regard it as being of any value in determining the real issue of this case.

From all the foregoing, it is obviously difficult to determine just what authority was directly responsible for the order. The witness Penfield perhaps explained the situation very well when he testified "Through the inter-relationship between [the German] I. G. and Chemnyco, and Pen-Chlor, the order was given in that manner."

Upon the whole record, it seems fairly inferable that appellee authorized Pen-Chlor, Inc., to make the order; that Pen-Chlor, Inc., in turn, gave such authorization to Chemnyco, Inc., and that Chemnyco, Inc., transmitted it to the German I. G., which then, upon its responsibility, ordered the filter press portion of the machine and some accessories from the manufacturers. The other accessories the German I. G. itself supplied under the authorization given.

Both the *pro forma* and consular invoices connected with the entry recite, in substance, that the merchandise was purchased "by Penchlor, 521 Fifth Avenue, of New-York N. Y. from I. G. Farbenindustrie Akt.-Ges. of Bitterfeld as per order accepted 19 11 1934 * * *." Accompanying those invoices is a detailed statement of items and prices of each. While invoiced to Pen-Chlor, Inc., the entry was made by a customs broker under the supervision of the office manager of appellee, who is not shown to have had any personal or official connection with Pen-Chlor, Inc.

As has been said, the final appraisement was based upon the cost of production. It must be assumed, therefore, that there was no foreign, export, or United States value. It is evident that the device was specially constructed for the use of appellee, or of Pen-Chlor, Inc., in carrying out the agreement between appellee and the German I. G., and that it was not an article of standard merchandise commonly or even occasionally imported into this country. So, it must have been known to the parties to the transaction that it would have to be valued for duty purposes upon the cost of production basis. There is no evidence that any inquiry was ever made by any person about the cost of production. The only inquiries shown to have been

made were those in 1933 as to the prices paid alone for filter presses used by the German I. G. in Germany. It was known to those in the United States that numerous accessories would be required and the German I. G. seems to have been given unlimited discretion and authority in the matter of supplying these. This was not unnatural in view of the fact that it was a partner with appellee in the business which was being established, but it seems to us that certain responsibilities of the German I. G., by reason of this very relationship, escaped the consideration of counsel for appellee and of the majority of the trial court. The issue has been presented as though this were an ordinary transaction where a United States importer bought merchandise abroad from one who, in a legal sense, was a stranger. Such obviously is not the case. The German I. G. was a partner, and, even assuming that the importer, under the agreement, was itself to pay all the costs of the machine, the duty of the German I. G. in relation to the entry was not completed by the mere sending of an invoice, subsequently found to be erroneous, to the importer.

No explanation whatever is attempted of how or why the errors occurred in the first invoice of June 1934, rendering necessary the second one of August 1934. The dispute which arose between the importer and the German I. G. after the former had received the August invoice did not involve any question as to whether the items complained of had actually been included in the importation, but rather, as best we can tell from the somewhat meager evidence upon the point, as to whether they were essential items for which the importer was liable to its partner abroad. So far as the importation was concerned, the items were included in the shipment at the time of entry and the question of the Government's right to duty upon them was wholly independent of any question relating to importer's liability to the German concern.

Mr. Hardcastle in his direct examination testified as follows:

Q. Did you receive a notice of an advance in value?—A. My company did.

Q. Did you authorize an appeal to reappraisement?—A. Yes.

Q. At the time you authorized this appeal to reappraisement was the matter as to the payment for this filter press and accessories in dispute?—A. It was.

Q. When was it finally settled as to the payment for this filter machine and accessories, covered by this entry?—A. Late in December 1935.

Q. And what was the amount finally paid for this filter machine and accessories?—A. The sum of 107,000 reichsmarks.

Q. What is the reason for the difference between the invoice of 93,204 reichsmarks, the price on the first invoice, and what you finally paid for the filter press and accessories?—A. We were finally convinced that these additional accessories that the I. G. *had included* were necessary for our operation. [Italics ours.]

Q. Were these additional accessories really additional to your original order?—A. Yes.

Q. Did the engineers of the I. G. add accessories which you did not expect would be added?—A. Yes.

Q. Does that account for the difference between the 88,000 reichsmarks which you approved in November 1934, and your final payment of 107,000 reichsmarks?—A. Yes.

It is not shown that any inquiries were made as to dutiable *value*, or cost of production at or about the time of the entry. It seems to be shown that there was an inquiry about the *price* of a filter machine alone in November 1933, and it was learned that the German I. G. had procured some at around 72,000 marks. The price quotations given by Wegelin & Huebner in January 1934 may be regarded as some evidence of the prices which would be charged for such of the accessories as that company might furnish, but there is no evidence as to any inquiry respecting the price, value, or cost of production of such accessories as were furnished by the German I. G. in addition to those had by it from Wegelin & Huebner. The importer simply accepted the invoice of June 1934 as correct and entered upon that basis without inquiry, no investigation whatever being made until after the receipt of the August 1934 invoice, and that investigation seems, as has been indicated, not to have been as to dutiable value, the sole concern of the Government, but as to the liabilities of the parties among themselves.

It is quite earnestly argued that the agents or officers of appellee were entitled to assume that the June 1934 invoice for about 93,000 reichsmarks (as a matter of fact it was for 96,200.6 reichsmarks, the entered value being arrived at by deducting nondutiable items) covered all the accessories because it was 10,000 or more reichsmarks above any price which had been quoted them. The argument is plausible and the fact itself, were this an ordinary transaction of importation, might be persuasive upon the issue involved, but, under all the circmstances shown, it is not so in this case. The shipper, the German I. G., a partner with appellee, the partnership functioning through Pen-Chlor, Inc., must or should have known that the June 1934 invoice was erroneous, or at least incomplete. It was only a short time comparatively until it rendered another invoice which exceeded the first by more than 20,000 reichsmarks. Pen-Chlor, Inc., partly owned by the German I. G., was the importer of record. It appears that the "Declaration of Purchaser" was signed by Mr. Hardcastle, as representing appellee, but appellee owned an interest in Pen-Chlor, Inc., and Mr. Hardcastle was a director in that company, as well as vice pres'dent of appellee.

It is, of course, true that the issue must be determined upon the question of intent at the time of entry, but, for the purpose of throwing light upon the matter of intent, the conduct of the petitioner in direct relation to the subject matter, before and subsequent to the

entry, may be looked to. We have already recited the substance of what occurred before the entry and made allusion to the fact that no investigation as to dutiable value was made after entry, not even after the receipt of the second invoice, while the whole matter of appraisement was still open and the entry could have been amended. The "Declaration of Purchaser," above alluded to, carried the usual provision whereby the signer bound himself to make known to the collector any information showing a different state of facts from the statements in the entry, but this admittedly was never done, and there is no explanation of the failure, except that the dispute, already alluded to, was on between appellee and the German I. G., the correspondence about which seems to have been carried on with the American I. G., and that by the time it was settled (appellee agreeing to pay the German I. G. 107,000 reichsmarks), the local appraiser had made the final appraisement in which the value of the merchandise was advanced. It may be said that the appraised value by the local appraiser was determined wholly independently of the invoices and of any information given by any of the United States parties to the transaction. As to what, if anything, was learned abroad the record is silent. Mr. Penfield testified that a United States customs agent visited him in February 1935 when there was conversation to the effect that the treasury department of either appellee or Pen-Chlor had been authorized to pay some 88,000 reichsmarks on the invoiced account. The witness testified that he did not call the attention of any Government officer to the August 1934 invoice after he received it. Also, he testified that after the meeting in February he had a telephone conversation with the same agent in which the agent said to him "that in the event that we made any further payments to be sure to notify the custom-house at Philadelphia, and I told him we would." Apparently no other payments were made or agreed to until after the final appraisement by the local appraiser. The agent seems to have visited him again in May 1936, but inasmuch as this was long after the final liquidation of the entry what then occurred could have no bearing upon the issue here. The customs agent was not called to testify in the case.

A case which seems to us to be analogous to the instant case in principle is that of Celanese Corp. of America v. United States, 18 C. C. P. A. (Customs) 417, T. D. 44680, and our opinion there, with certain of the cases therein cited, is viewed as a pertinent authority here notwithstanding certain differences as to facts pointed out in the brief on behalf of appellee.

Some other matters are discussed and argued by counsel for the respective parties but they are not of a character which renders it necessary to discuss them here.

In view of all the facts recited and for the reasons stated, we find ourselves unable to concur in the decision below.

The judgment of the United States Customs Court is, therefore, *reversed.*

LENROOT, Judge, dissents.